Sam Johnson
JOHNSON & MONTELEONE, L.L.P.
405 South Eighth Street, Suite 250
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
sam@treasurevalleylawyers.com
Idaho State Bar No. 4777


Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LUPITA N. CONNOR,<br><br>Plaintiff,<br><br>v.<br><br>MICRON TECHNOLOGY, INC., a Delaware corporation, and JOHN/JANE DOES I through X whose true identities are presently unknown,<br><br>Defendants. | Case No.  CIV 05-275-S-EJL<br><br>PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

COMES NOW, Plaintiff, Lupita N. Connor, by and through Sam Johnson, of Johnson & Monteleone, L.L.P., her attorneys of record, and pursuant to D.Id.L.Civ.R. 7.1(c)(2), submits the following statement of disputed facts demonstrating summary judgment is not warranted in this case and that the instant matter requires resolution through trial by jury.

In support of its motion, the Defendant submitted excerpts from the deposition transcript of Plaintiff as Exhibit "B" to the Affidavit of Patricia M. Olsson. The

Defendant also submitted the two (2) charges filed by Plaintiff with the Idaho Human Rights Commission as Exhibit "A" to the Affidavit of Patricia Olsson. Rather than re-submitting this evidence, Plaintiff shall simply cite to the place in the record where it already exists.

Any additional evidence beyond the above referenced items will be submitted in the form of and attached to the Affidavit of Plaintiff in Opposition to the Motion for Summary Judgment, and cited accordingly herein.

1. Plaintiff Lupita Connor (sometimes hereinafter "Connor") worked for Defendant Micron Technology, Inc., (sometimes hereinafter "Micron") for nearly six (6) years from March 24, 1998, until January 14, 2004, the day on which Micron terminated her employment. (*See* Affidavit of Plaintiff in Opposition to the Motion for Summary Judgment ("Connor Aff."), ¶ 2).

2. For roughly five (5) years of her employment with Micron, Connor was subjected to what she describes as unwelcome sexual advances and requests for sexual favors from her immediate supervisor in the Mark and Scan of the Test Department, Mr. John Morin ("Lead Operator"). *Id, ¶ 3.* Connor explains how the unwelcome sexual advances began in year 1998 or 1999, and continued through the time of Mr. Morin's termination on or about January 27, 2003. *Id.*

3. Morin commented how Connor "looked really sexy" when she wore a baseball cap. (*See* Affidavit of Patricia M. Olsson ("Olsson Aff."), Exhibit "A", Bates number MTI0633). Morin told Connor that he "enjoyed anal sex and his wife had not provided him with any pleasure."

*Id.* Morin described himself to Connor as a real "HornDog" and explained how he could "never get enough of sex." *Id.* Morin invited Connor to go dancing on many occasions. *Id.*

4. Morin approached Connor and told her a fellow operator had filed a sexual harassment claim against him and inquired if Connor planned to file suit. *Id.* After the fellow operator was terminated, Morin came to Connor and bragged how no one could touch him because he had dirt on upper management and that he could get everyone in trouble. *Id,* Bates number MTI0633-34.

5. Morin continued to insist that Connor go out dancing with him. *Id.* He asked Connor to meet him in a parking lot and he would take her dancing. *Id.* Connor felt pressured to meet him there, and when she arrived she got out and told him she could not go, that she loved her husband and felt it was wrong. *Id.* At first, Morin acted as though he was "ok with it", but later ignored Connor at work, isolated her in the far corner and did not speak to Connor for about four weeks. *Id.*

6. After time, Morin acted like he was no longer mad at Connor, and immediately started asking her out again even though Connor kept telling him no. *Id.* Out of fear, and three or more episodes of the cold shoulder, Connor finally agreed to go dancing with Morin. *Id.* Connor described the events of the evening in the following way:

> I met him at the parking lot and he took me to a dance club. He bought me drink after drink and I became extremely intoxicated. When he took me to my car he began to kiss me and he attempted to take

> off my skirt but I told him no. He then unzipped his pants in the back seat, pulled out his private part and asked me for oral sex. I recall starting to perform oral sex but then I passed out. When I came out of my drunken stupor I told him that I was intoxicated and had made a terrible mistake and I was really sorry. I explained to him that I only went out with him because I was afraid he would be mad at me at work. I indicated that I loved my husband and I wanted to go home and forget the whole event. Nevertheless, so as to control me and to further harass me he used the incident to discourage me from filing any sexual harassment charges. My life at work was miserable before and only became worse.

*Id.*

7. After the above incident, Morin started anew his manipulative pattern of treating Connor poorly to pressure her into performing sexual favors. Upon learning Connor and her husband were expecting another child, Morin said to Connor, "I'm sure that you need more sex now because I hear pregnant woman can't get enough!" *Id,* Bates number MTI0635. On Connor's first day back to work after her father passed away, Morin approached her, told her she looked sexy, and stated how he knew Connor's father and Morin's deceased mother were both in heaven, and wanted the two of them to have an affair. *Id.* Connor described how these comments left her sick to her stomach and noted she could not believe how depraved Morin could be to say such a thing about the father she loved so dearly. *Id.* Connor left work that evening, had a nervous breakdown, and her husband filed a sexual harassment complaint with Micron on her behalf. *Id.*

8. In the filings with the Idaho Human Rights Commission, Connor explains in detail her reasons, beyond the pressures imposed by Morin, for not notifying Micron sooner of her problem with his behavior. *Id,* Bates number MTI0633. It had to do with the fact that when she made an earlier complaint to Micron about Roxanne Madonna (Morin's predecessor) and Ms. Madonna's treatment of Asians and Latinos, Micron dismissed her outright and began retaliating against her. *Id.* (*See also* excerpts from Connor's deposition transcript attached as Exhibit "B" to the Olsson Aff., p. 33, Ll. 16-25, p. 34, Ll. 1-2). Connor also discusses in her deposition the culture at Micron of dispensing with employees who complain about other employees for their discriminatory conduct. (*See* excerpts from Connor's deposition transcript attached as Exhibit "B" to the Olsson Aff., p. 80, Ll. 21-25, p. 81, Ll. 1-2.

9. In the October 29, 2003, charge of discrimination, Connor stated under the penalty of perjury the nature and history of the advances Mr. Morin made towards her during the relevant portions of her employment with Micron. Connor Aff., ¶ 4. This October 29, 2003, charge also includes Connor's claims against Micron for retaliating against her for lodging a complaint of sexual harassment and for participating in the investigation of the same. *Id.*

10. After filing the October 29, 2003, charge, Micron continued to harass and retaliate against Connor which ultimately culminated in Micron's termination of her employment on January 14, 2004. *Id, ¶ 5.* As a result

of the continued harassment and retaliation and ultimate termination, Connor filed a second "CHARGE OF DISCRIMINATION" under the penalty of perjury with the Idaho Human Rights Commission/Equal Employment Opportunity Commission on February 25, 2004. *Id.* This charge essentially covers the time frame between the facts set forth in the first charge and the time of Connor's January 14, 2004, termination. *Id.*

11. After reviewing Micron's responses to Connor's charges of discrimination, Connor filed a comprehensive rebuttal statement with a variety of exhibits and supporting documents appended thereto. *Id, ¶ 6.*

12. Based upon all the filings and submissions referenced above, the Idaho Human Rights Commission issued its "INVESTIGATOR'S REPORT AND COMMISSION DETERMINATION" on April 18, 2005. *Id, ¶ 7.* Director, Ms. Leslie R. Goddard, signed the determinations on behalf of the full Commission. Ms. Jane E. Hochberg, Deputy Attorney General, conducted the analysis on behalf of the state of Idaho. *Id.*

13. With respect to the charge of sexual harassment, the commission found, "Complainant has shown that Mr. Morin's conduct was sufficiently severe or pervasive to alter the conditions of her employment and created an abusive working environment." *Id, ¶ 8.* The commission also found, "Mr. Morin's job duties include the authority to assign job duties and tasks and writing up employees for problems and, therefore, he is considered a supervisor." *Id.* The commission further found:

> While Respondent acted promptly to correct Mr. Morin's conduct in January 2003, evidence shows

> that Respondent knew of at least some of Mr. Morin's previous acts of sexual harassment yet did not take appropriate corrective action at that time and did not exercise reasonable care to prevent future harassing behavior by Mr. Morin. Respondent has not proven that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior.

*Id.*

14. On the issue of whether Connor timely filed her charges, the Commission found:

   > Hostile environment claims, however, "by their very nature . . . involve repeated conduct. Cherosky v. Henderson, 330 F.3d 1243, 1246 (9th Cir. 2003). Hostile environment claims "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Id. (quoting National Railway Passenger Corp. v. Morgan, 536 U.S. 101, 127 (2002)). Complainant's hostile environment claim will, therefore, be considered timely.

*Id, ¶ 9.*

15. Based upon its findings, the Commission ruled that on the facts presented **"the Commission finds probable cause** to believe that Respondent has engaged in unlawful discrimination in the form of sexual harassment." *Id, ¶ 10.*

16. With respect to the charges of retaliation, the Commission found **"no probable cause** to believe that Respondent retaliated against Complainant. *Id, ¶ 11.*

17. The instant litigation ensued on July 11, 2005.

DATED: This 5 day of January, 2007.

JOHNSON & MONTELEONE, L.L.P.

_____
Sam Johnson
Attorneys for Plaintiff

## CERTIFICATE OF MAILING, DELIVERY, OR FACSIMILE TRANSMISSION

I CERTIFY that on January 5, 2007, I caused a true and correct copy of the foregoing document to be:

| | |
|---|---|
| ☐ mailed<br>☐ hand delivered<br>☒ CM/ECF Electronic Filing<br>☐ transmitted fax machine to: | Patricia M. Olsson, Esq.<br>MOFFATT, THOMAS, BARRETT, ROCK & FIELDS, CHTD.<br>101 S. Capitol Blvd., 10th Floor<br>Boise, ID 83701-0829 |

JOHNSON & MONTELEONE, L.L.P.

_____
Sam Johnson
Attorney for Plaintiff